UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RAHUL MANCHANDA,

                    Plaintiffs

vs.

NAVIENT STUDENT LOANS &
EDUCATIONAL CREDIT MANAGEMENT
CORPORATION ("ECMC"),

           Defendant/Third-Party
           Plaintiff

(WHP)

Index No.  1:19-cv-05121

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF RAHUL MANCHANDA'S <u>MOTION FOR SUMMARY JUDGMENT</u>

<u>**On the Brief**</u>

**John P. Fazzio**


**Oral Argument Requested**

John P. Fazzio, Esq.
FAZZIO LAW OFFICES
305 Broadway, 7th Floor, Ste. 9
New York, NY 10007
Phone: (201) 529-8024
Fax: (201) 529-8011
jfazzio@fazziolaw.com

*Attorneys for Plaintiff*
*Rahul Manchanda*

## TABLE OF CONTENTS

Table of Authorities……………………………………………………………iii-vi

Preliminary Statement……………………………………………………….1

Statement of the Facts……………………………………………………..1

   I.     SUMMARY JUDGMENT STANDARD………………………………………1

   II.    SUMMARY JUDGMENT SHOULD BE GRANTED ON
        PLAINTIFF'S DECEPTIVE BUSINESS PRACTICES CLAIMS……………2-7

        A.    GBL § 349 Legal Principles……………………………………………….2-3

        B.    GBL § 349 Application to Plaintiff……………………………………….3-7

   III.   SUMMARY JUDGMENT SHOULD BE GRANTED ON
        PLAINTIFF'S FAIR DEBT COLLECTION PRACTICES
        ACT ("FDCPA") CLAIMS…………………………………………………7-18

        A.    Principles of FDCPA Law………………………………………………...7-9

        B.    FDCPA's Application to ECMC as a Debt Collector ………………………9-13

        C.    FDCPA's Application to ECMC's Collection Acts …………..…………13-18

   IV.   CONCLUSION……………………………………………………...………..18

# TABLE OF AUTHORITIES

## Cases

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 247-8 (1986) ....................................................................................................1

Bailey v. Security Nat'l Servicing Corp.,
154 F.3d 384, 387 (7th Cir. 1998) .........................................................................................10

Baptiste v. Carrington Mtge. Servs., Inc.,
2017 WL 2861670, at *2 (E.D.N.Y. 2017)...........................................................................8, 9

Brannan v. United Student Aid Funds, Inc.,
84 F.3d 1260, 1262-1263 (9th Cir. 1996)..............................................................................12

Bridge v. Ocwen Fed. Bank, FSB,
682 F.3d 355, 362 (6th Cir. 2012)………………………………………….…………9, 10

Celotex Corp. v. Catrett,
477 U.S. 317, 325 (1986)………………………………………….……………….....…1

Cirkot v. Diversified Systems,
839 F.Supp. 1480 (M.D.Ala. 1987)………………………………………….…………..10

Clomon v. Jackson,
988 F.2d 1314, 1318 (2d Cir. 1993)………………………………………….…………8, 13

Cohen v. Ditech, Fin LLC,
342 F. Supp. 3d 460, 466 (S.D.N.Y. 2018) ............................................................................8

Dister v. Continental Group, Inc.,
859 F.2d 1108, 1114 (2d Cir. 1988) ……………………………………….…………....…1

Ellis v. Solomon & Solomon, P.C.,
591 F.2d 130, 135 (2d Cir. 2010) …………………………………….…………….......…8

Fritz v. Resurgent Cap. Servs., LP,
855 F.Supp. 2d 163, 173 (E.D.N.Y. 2013)………………………………....…………………2, 3, 8, 13

Gabriele v. Am. Home Mortg. Servicing, Inc.,
503 Fed. App'x. 89, 94 (2d Cir. 2012) …………………………….…………….…………8

Gallo v. Prudential Residential Serv. Ltd. P'Ship.,
22 F.3d 1219, 1223-24 (2d Cir. 1994) ……………………..……………..…..……………1

Gemmy Indus. Corp. v. Chrisha Creations Ltd.,
2004 U.S. Dist. LEXIS 11468 (S.D.N.Y June 23, 2004)…………………..……………...……………1

Hines v. HSBC Bank USA,
2016 WL 5716749, at *10 (E.D.N.Y. 2016)……………………..……………………..……...……………9

Holmes v. Telecredit Service Corp.,
736 F.Supp. 1289, 1292 (D.Del. 1990)………………..……………………………...……………10

Jordan v. Tucker, Albin and Assocs., Inc.,
2017 WL 2223918, at *8 (E.D.N.Y. 2017)………………..……………………………...…………3

Kassel v. Univ. Fidelity LP.,
2014 WL 824335, at *2 (E.D.N.Y. 2014)……………..…………………………...……....…………9

Kimber v. Federal Financial Corp.,
668 F.Supp. 1480 (M.D.Ala. 1987)………………..………………………...…….....……………10

Kloss v. RBS Citizens, N.A.,
996 F. Supp. 2d 574, 597 (E.D. Mich. 2014)……………..………………………...…….........9

Martin v. Select Portfolio Serving Holding Corp.,
No. 1:05-CV-273, 2008 WL 618788, at *5 (S.D. Ohio Mar. 3, 2008)……………..…………………10

Martinez v. Lvnv Funding, LLC,
2016 WL 5719718, at *3 (E.D.N.Y. 2016)………………..………………………………………2

Montgomery v. Huntington Bank,
346 F.3d 693, 698 (6th Cir. 2003)………………..…………………………………………...9

Moukengeschaie v. Eltman,
2016 WL 1274541 (E.D.N.Y. 2016)………………..……………………………………8

Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,
85 N.Y.2d 20, 24 (1995)………………..…………………………………………2, 3

Perry v. Stewart Title Co..,
756 F.2d 1197, 1208 (5th Cir. 1985). ………………..…………………………………11

Pollice v. Nat'l Tax Funding, L.P.,
225 F.3d 379, 403-04 (3d Cir. 2000)…………….……………………………………….....10, 11

Rowe v. Educ. Credit Mgmt. Corp.,
559 F.3d 1028, 1032 (9th Cir. 2009)…………….……………………………...………11, 12

Schlosser v. Fairbanks Capital Corp.,
323 F.3d 534 (7th Cir. 2003)…………….…………………………...……......................10

Schuh v. Druckman & Sinel, L.L.P.,
662 F. Supp. 2d. 454, 462 (S.D.N.Y. 2000)…………….………………………...………..8

Wadlington v. Credit Acceptance Corp.,
76 F.3d 103, 106-07 (6th Cir. 1996)…………….………………………...……...........11

Whitaker v. Ameritech Corp.,
129 F.3d 952, 958 (7th Cir. 1997)…………….……………………...……...............10

Wilson v. NW Mut. Ins. Co.,
625 F.3d 54, 64 (2d Cir. 2010)…………….…………………………...……......................2

**Statutes**

15 U.S.C. § 1692(a) ...................................................................................................................10

15 U.S.C. § 1692(a)(6)…………………………………………………….8, 9, 11, 12

15 U.S.C. § 1692(a)(6)…………………………………………………….8, 9, 11, 12

15 U.S.C. § 1692(c)(a)(1)…………………………………………………….14, 16

15 U.S.C. § 1692(c)(a)(2)…………………………………………………….14, 17

15 U.S.C. § 1692(d)(1)-(6)…………………………………………………….14, 17

15 U.S.C. § 1692(e)…………………………………………………….8, 13, 14, 15, 17

15 U.S.C. § 1692(e)(4)…………………………………………………….13, 15, 16

15 U.S.C. § 1692(e)(5)…………………………………………………….8, 13, 15

15 U.S.C. § 1692(e)(10)…………………………………………………….8, 16

15 U.S.C. § 1692(e)(11)…………………………………………………….13, 16

34 C.F.R. § 682.410(b)(2)……………………………………………………………………………15, 16

34 C.F.R. § 682.410(b)(5)(ii)……………………………………………………………………14, 15, 18

N.Y. Gen. Bus. Law § 349………………………………………………………………...2, 3, 7

**Rules**

Fed. R. Civ. P. 56(c) ................................................................................................................1

## PRELIMINARY STATEMENT

## STATEMENT OF FACTS

Plaintiff respectfully directs the Court to Plaintiff's Undisputed Statement of Material Facts pursuant to Rule 56.1 submitted with this filing and referenced herein.

## I.   SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is mandated, where there exists no "genuine" issue of "material" fact; a dispute over irrelevant or unnecessary facts will not preclude summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-8 (1986). "The moving party may obtain summary judgment byshowing that little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Serv. Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Id. at 1224 (citing Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)).

A party opposing summary judgment cannot demonstrate the existence of a genuine issue where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative.'" Gemmy Indus. Corp. v. Chrisha Creations Ltd., 2004 U.S. Dist. LEXIS 11468 (S.D.N.Y June 23, 2004). If the non-moving party "fail[s] to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then "the moving party is entitled to summary judgment as a matter of law." Celotex, 477 U.S. at 322-23.

## II.   SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFF'S DECEPTIVE BUSINESS PRACTICES CLAIMS

### A. GBL § 349 Legal Principles

Section 349 makes it unlawful to commit "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service…." N.Y. Gen. Bus. Law § 349.   The Complaint alleged that ECMC engaged in materially deceptive practices that were consumer-oriented and which resulted in harm to Manchanda.   By way of example, Manchnda alleges that he enrolled in ECMC's rehabilitation program which allows federal student loan borrowers who are in default to effectively 'cure' one or more defaulted loans. (Compl. ¶ 14). Manchanda was harmed by ECMC failing to provide debtor counseling to 'cure' his default and instead steering Manchanda into a Rehabilitation Program that triggered "collection costs" of $36,559.19 being added on to his total loan balance. (***).

Section 349 allows for enforcement by the New York State Attorney General, as well as for private rights of action. Such actions may seek injunctive relief, damages and attorneys' fees. Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 24 (1995). To establish a violation under Section 349, a plaintiff must demonstrate: (1) that the act or practice was consumer oriented; (2) that it was misleading in a material respect; and (3) that the plaintiff was injured as a result. Wilson v. NW Mut. Ins. Co., 625 F.3d 54, 64 (2d Cir. 2010); see also Martinez v. Lvnv Funding, LLC, 2016 WL 5719718, at *3 (E.D.N.Y. 2016).

The "consumer oriented" prong is satisfied by showing that the acts forming the basis of the complaint are not private disputes but instead could have a broad impact on "consumers at large." Oswego, 85 N.Y.2d at 25. Thus, acts within the statute must "potentially affect similarly situated consumers." Oswego, 85 N.Y.2d at 27; Fritz v. Resurgent Cap. Servs., LP, 955 F. Supp. 2d 163, 173 (E.D.N.Y. 2013). In the context of debt collection cases, the "consumer oriented"

prong is satisfied where the conduct forming the basis of the complaint was a "normal part of defendants' business," in which case the practice could "have a broad impact on consumers at large." Jordan v. Tucker, Albin and Assocs., Inc., 2017 WL 2223918, at *8 (E.D.N.Y. 2017) (quoting Fritz, 955 F. Supp. 2d at 173).

### B. GBL § 349 Application to Plaintiff

Here, there is no factual dispute that ECMC engaged in materially deceptive practices that were consumer-oriented and that Mr. Manchanda suffered damages from these deceptive practices, and thus, summary judgment should be granted on Plaintiff's deceptive business practices claim pursuant to GBL § 349.

First and foremost, there is no dispute that student loan debt collection has a broad impact on "consumers at large" as approximately 44.7 million Americans have student loan debt.[1] See Oswego, 85 N.Y.2d at 25. Additionally, there is no dispute that the practices taken by ECMC were materially deceptive and misleading, as ECMC clearly steered Mr. Manchanda into a predatory Rehabilitation Agreement in which they fraudulently implemented a **$30,000 to $40,000 collection fee**, in addition to reporting Mr. Manchanda's default status of his student loans to all national consumer reporting agencies, even though Mr. Manchanda entered into the Agreement with ECMC to prevent his credit from being damaged. (Plaintiff's Statement of Undisputed Material Facts ("SOUMF") ¶¶ 27-28).

To further articulate ECMC's deceptive practices in violation of GBL § 349, ECMC, through its Agent, Mithun Sarang, called Mr. Manchanda on or about April 14, 2017 at his home after hours to convinc him to enter into a Rehabilitation Agreement to avoid further collection activity. (SOUMF ¶ 23.)  ECMC Agent Mithun Sarang started the conversation by saying he was

---

[1] https://studentloanhero.com/student-loan-debt statistics/#:~:text=General%20student%20loan%20debt% 20facts&text=The%20most%20recent%20data%20indicate,Americans%20with%20student%20loan%20debt

calling "***about your defaulted federal student loans… to give you options of avoiding any future***

***wage garnishments***." (SOUMF ¶ 24.)  During the call with Mr. Mithun Sarang he advised Mr.

Manchanda that the collection costs were "***an unavoidable consequence of default***" stating that

"***this is just what happens when you default***." (SOUMF ¶ 23.)  Furthermore, Mr. Sarang promptly

troublingly asked for information to contact Mr. Manchanda at work, asked for his work phone

number, if ECMC could auto-dial Mr. Manchanda at work, and confirmed the address for his

employer, which had never changed for 20 years. (SOUMF ¶ 24.)

What is even more concerning is that Mr. Sarang proceeded to claim to be presenting

Mr. Manchanda with "all his options", but then dropped "the bomb" on Mr. Manchanda that his

loan balance was now ***$161,349.62 and not the $128,693.44*** stated in the Notice of Default.

(SOUMF.)  Specifically, Mr. Sarang stated, "***the current balance is $161,349.62***, do you have the

ability or resources Rahul to pay that amount in full?" (SOUMF ¶ 25.)  Rightfully so, Mr.

Manchanda responded with shock, stating, "***Wait… $161 or $125, I thought it was $125…***" and

"***That's wrong, that's got to be wrong, I even got a letter from ECMC….***" (SOUMF ¶ 25.)  In

response, Mr. Sarang then clarified, "Your principal is $124,790 and then so, ***collection costs were***

***applied here as well*** and that's probably the differential that you're looking in reference to" and

further clarified that "alright, so your principal balance … is $124,790.43, the interest is $4,977.52,

***the collection costs are $31,580.67.***" (SOUMF ¶ 25.)

Mr. Manchanda's natural response to the draconian and byzantine collection costs was

"***Woah, Woah!***" (SOUMF ¶ 25.)  Mr. Sarang's response was alarming, disturbing and an

illustration of ECMC's deceptive practices that were exhibited throughout this entire collection

call and Mr. Manchanda's horrible experience with ECMC: "***Correct, That's what happens when***

***you get in default…***" (SOUMF ¶ 25.)  Again, after Mr. Manchanda's natural response "I mean 30

grand, why 30 grand in collection costs, I mean I didn't sign up for that.  Who defaulted my loan,

4

you guys, that's crazy" Mr. Sarang responded, "***Well, that's what happens when you get in default…***" (SOUMF ¶ 25.)

Shortly thereafter, in an attempt to steer Mr. Manchanda into a "solution" to cure the problem ECMC originated by placing Mr. Manchanda in default and charging him $31,580.67 in additional collection charges and interest for a total of a $36,559.19 upcharge on a loan Mr. Manchanda already could not afford, Mr. Sarang stated in his fraudulent sales pitch, "With the information that you are providing me right now, I'm able to give you monthly payments at $5 on a monthly basis.  And you're like, what's $5 gonna do?  I get it.  ***It's gonna get you out of default. So as long as you can show us that you're gonna be able make 9 out of 10 on-time monthly payments, you're gonna go ahead and get yourself out of default***, at which time you're gonna be eligible for deferments, forbearances, financial aid, any negative credit reporting of the default requested to be removed after 45-days as well, because I'm pretty sure this is affecting your credit report very negatively right now.  And just by making the $5 payments you're gonna get yourself out of default, at which point in time, ***finally when you do get out of default, you can say hey, originally my principal balance was $125,000, I was placed in a default, and I'm disputing the collection costs on behalf of the account***, so there's multiple avenues you'd like to take, but I'm a big believe that knowing is half the battle… you know what I mean." (SOUMF ¶ 26.)

Rightfully so, Mr. Manchanda then asked the operative question, "***I appreciate that, would that take off the collection costs?  Would that take off the collection costs to or just the default?***" (SOUMF ¶ 26.)  Conveniently, Mr. Sarang dodged the question and said he couldn't advise on that, but once Mr. Manchanda got "out of default" he could "contest it" with the new lender. (SOUMF ¶ 26.)

The facts of this case are clear. Mr. Manchanda was duped into the Rehabilitation Program  by Mr. Sarang's false and deceptive promises that he would be out of default and that he

can dispute the collection costs on behalf of his account.  Additionally, the Rehabilitation Program paperwork that was ultimately presented to Mr. Manchanda on the same day as his call with Mr. Sarang, on April 14, 2017, contained draconian and byzantine *collection costs of 23.4% added-in, which increased the loan balance from $124,790.43 to $161,349.62 or by a whopping 130%.* (SOUMF ¶ 11.)

Therefore, by the loan balance loan, it is evident that ECMC falsely advertised the Rehabilitation Program and materially misled Mr. Manchanda into entering the program and making him believe that he had no choice but to pay the higher loan balance containing the *$36,559.19* in collection costs, because applicable law does not permit the addition of these collection charges if the loan is timely rehabilitated, consolidated, or in fact, which is the case here, never received by the debtor. (SOUMF ¶ 12.)

As is customary with ECMC's ruthless collection activities against borrowers suffering financial hardship, on or about February 6, 2017, ECMC allegedly sent Mr. Manchanda a Notice of Default noting that *"collection costs of up to 23.4% [would be] added to [the] loan pursuant to federal regulations"* if the loan balance was not paid off within 60 days or by *April 7, 2017.* (SOUMF ¶ 11.). However, Mr. Manchanda never received the Notice of Default because he moved from 1 Wall Street, New York NY approximately one (1) year prior to February 6, 2017. (SOUMF ¶ 11.)  What is even more disturbing is the fact that on February 6, 2017 ECMC *knew* that Mr. Manchanda moved from 82 Beaver Street, Apt. 301, New York, NY 10005 and lived at 150 W 51st St., Apt. 2106, New York, NY 10019.   To begin the call Mr. Sarang stated, " **I just wanted to make sure that the information we have for you is *still correct*. I have. Let's see here. Is it 150 West 51st apartment, 2106? Yep. New York, NY**. (SOUMF ¶ 16.)

Therefore, in addition to ECMC's false advertising and material misrepresentations of the Rehabilitation Program to Mr. Manchanda making him believe that he had no choice but to

pay the higher loan balance containing the **$36,559.19** in collection costs, Mr. Manchanda never had the chance to address these collection charges because he clearly never received the Notice of Default.  As such, Mr. Manchanda was not required to agree to these excessive collection costs as a condition of rehabilitating his loan, despite the material misrepresentations made by Mr. Sarang. For the reasons, there is no factual dispute that ECMC engaged in materially deceptive practices.

Finally, there is no factual dispute that Mr. Manchanda suffered damages from ECMC's deceptive practices.  Mr. Manchanda entered into a Rehabilitation Program on April 14, 2017 based on the assertions that he would be out of default and that he can dispute the collection costs on behalf of his account.  However, despite entered into a Rehabilitation Program, not even *one month* later, on May 7, 2017, ECMC filed a "Notification of Report to Consumer Reporting Agencies" indicating that "[s]ince you did not pay the full balance of your defaulted student loan(s) within 60 days of the notice of default, Educational Credit Management Corporation ("ECMC") has reported the default status to all national consumer reporting agencies, as required by federal regulation." (SOUMF ¶ 27.) Clearly, this notification came as an absolute complete shock to Mr. Manchanda, who had just entered into a Rehabilitation Program with ECMC to prevent his credit from being damaged. (SOUMF ¶ 27.) For the reasons, there is no factual dispute that Mr. Manchanda suffered damages from ECMC's deceptive practices.

Thus, there is no factual dispute that ECMC engaged in materially deceptive practices that were consumer-oriented and that Mr. Manchanda suffered damages from these deceptive practices, and thus, summary judgment should be granted on Plaintiff's deceptive business practices claim pursuant to GBL § 349.

## III.   SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFF'S FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA") CLAIMS

### A.  Principles of FDCPA Law

The FDCPA prohibits debt collectors from the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C.A. § 1692e. On its face § 1692e applies only to "debt collectors." Cohen v. Ditech, Fin. LLC, 342 F. Supp. 3d 460, 466 (S.D.N.Y. 2018), Schuh v. Druckman & Sinel, L.L.P., 662 F. Supp. 2d 454, 462 (S.D.N.Y. 2000). The FDCPA defines "debt collector" as "any person who uses nay instrumentality of interstate commerce or the mails in any busines the principal purpose of which is the collection of any debts, or who regularly collects or attempt to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692(a)(6).

The statute sets forth a list of various representations which are prohibited, including, inter alia, "[t]he threat to take any action that cannot legally be taken or that is not intended to be taken," and "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." U.S.C.A. § 1692e(5), e(10). The statutory list is not exhaustive. As such, "a debt collection practice can be a 'false, deceptive, or misleading' practice in violation of § 1692e even if it does not fall within any of the subsections of § 1692e." Clomon v. Jackson, 988 F.2d 1314, 1318 (2d Cir. 1993); Fritz, 955 F. Supp. 2d 163 at 169. Congress enacted the FDCPA to protect consumers. Moukengeschaie v. Eltman, 2016 WL 1274541 (E.D.N.Y. 2016).

To that end, courts in this circuit evaluate FDCPA "misstatement" claims based from the objective perspective of the "least sophisticated consumer." Baptiste v. Carrington Mtge. Servs., Inc., 2017 WL 2861670, at *2 (E.D.N.Y. 2017); See Ellis v. Solomon & Solomon, P.C., 591 F.3d 130, 135 (2d Cir. 2010). Even under this broad standard, "not every technically false representation by a debt collector amounts to a violation of the FDCPA." Gabriele v. Am. Home Mortg. Servicing, Inc., 503 Fed. App'x. 89, 94 (2d Cir. 2012). Instead, the statement at issue must be material to be actionable under the FDCPA. See Fritz, 955 F. Supp. 2d at 170. A false statement is deemed material

8

if it would "influence a consumer's decision or ability to pay or challenge a debt.'" <u>Hines v. HSBC Bank USA</u>, 2016 WL 5716749, at *10 (E.D.N.Y. 2016) (quoting <u>Kassel v. Univ. Fidelity LP</u>, 2014 WL 824335, at *2 (E.D.N.Y. 2014) (internal citation omitted)).

In light of the objective nature of the least sophisticated consumer standard, "the determination of how the least sophisticated consumer would view language" presents a question of law. <u>Baptiste</u>, 2017 WL 2861670, *2 (E.D.N.Y. 2017) (citations omitted).

### B. FDCPA's Application to ECMC as a Debt Collector

This case turns on whether Plaintiff has established that ECMC is a "debt collector" as defined by the FDCPA.  As stated previously, a "debt collector" is "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). Liability under the FDCPA "attach[es]" to only "those who meet the statutory definition of a 'debt collector.'" <u>Montgomery v. Huntington Bank</u>, 346 F.3d 693, 698 (6th Cir. 2003).

It is Plaintiff's burden to establish that ECMC is a debt collector. <u>Kloss v. RBS Citizens, N.A.</u>, 996 F. Supp. 2d 574, 597 (E.D. Mich. 2014). To meet that burden, Plaintiff must show that his loan was in default at the time ECMC acquired the loan or that ECMC treated the loan as if it was in default. <u>Bridge v. Ocwen Fed. Bank</u>, FSB, 682 F.3d 355, 362 (6th Cir. 2012). This rule "is based on the premise that an entity that acquires a current, non-defaulted debt in order simply to continue servicing it is acting much like the original creditor that created the debt," but, "[o]n the other hand, if it simply acquires the debt for collection, it is acting more like a debt collector." <u>Kloss</u>, 996 F. Supp. 2d at 597 (quotation marks and citation omitted).

But courts also look beyond the black and white. Indeed, the FDCPA applies not only to entities that "acquired a debt in default" but also to entities that "treated the debt as if it were in

default at the time of the acquisition." <u>Bridge</u>, 682 F.3d at 362. In other words, "a FDCPA defendant cannot escape coverage under the Act" by relying on a technicality, like a "clerical mistake, or other error," when, all the while, attempting to collect a defaulted debt. <u>Id.</u> at 362-63.

In deciding whether a loan was in default when an entity acquired it, a court may refer to the parties' contractual definition of "default." <u>See</u>, <u>e.g.</u>, <u>Martin v. Select Portfolio Serving Holding Corp.</u>, No. 1:05-CV-273, 2008 WL 618788, at *5 (S.D. Ohio Mar. 3, 2008) (noting that the parties' contract considered a loan to be in default when a payment was 45 days overdue).

A financial institution which purchases delinquent debts is a "debt collector" within the meaning of the FDCPA with respect to the delinquent debts. <u>Schlosser v. Fairbanks Capital Corp.</u>, 323 F.3d 534 (7th Cir. 2003); <u>Kimber v. Federal Financial Corp.</u>, 668 F.Supp. 1480 (M.D.Ala. 1987); <u>Cirkot v. Diversified Systems</u>, 839 F.Supp. 941 (D.Conn. 1993); <u>Holmes v. Telecredit Service Corp.</u>, 736 F.Supp. 1289, 1292 (D.Del. 1990).

Under the FDCPA, the terms "debt collector" and "creditor" are mutually exclusive.  To distinguish between these two possibilities, the Act uses the status of the debt at the time of the assignment:

> "(6) The term "debt collector" means any person who . . . regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. . . . The term does not include —
>
> (F) any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . (iii) ***concerns a debt which was not in default at the time it was obtained by such person.***"
>
> 15 U.S.C. § 1692a (emphasis added).

In other words, the Act treats assignees <u>as debt collectors</u> *if* the debt sought to be collected ***was in default when acquired by the assignee***, and <u>as creditors</u> *if* it was not. <u>See Bailey v. Security Nat'l Servicing Corp.</u>, 154 F.3d 384, 387 (7th Cir. 1998); <u>Whitaker v. Ameritech Corp.</u>, 129 F.3d 952, 958 (7th Cir. 1997); <u>see also Pollice v. Nat'l Tax Funding, L.P.</u>, 225 F.3d 379, 403-04 (3d Cir.

2000); Wadlington v. Credit Acceptance Corp., 76 F.3d 103, 106-07 (6th Cir. 1996); Perry v. Stewart Title Co., 756 F.2d 1197, 1208 (5th Cir. 1985).

First and foremost, it is absolutely clear that Mr. Manchanda's loan was deemed to be in default and delinquent as of July 6, 2014. (SOUMF ¶ 46.). To note, as stated in depth in Plaintiff's Statement of Material Facts, ECMC never administered Plaintiff's loan in a fiduciary capacity at any relevant time, but rather acted as a "debt collector" tasked with post-default collections, as ***in instances where the bankruptcy case concluded and the loans were in default at the time the borrower filed bankruptcy***, **the loans shall be assigned** by ECMC/the Federal Services Bureau **to ECMC/the Guarantor** *for post-default collections*. (SOUMF ¶¶ 5-15.)

Accordingly, is evident that Mr. Manchanda's loan went into default on July 6, 2014, when the bankruptcy claim was made, ***after which*** ASA transferred all rights, title and interest of the loan to ECMC on July 10, 2014 and ECMC acquired the defaulted loan.  (SOUMF ¶ 47.).

ECMC falsely relies on the fact that the FDCPA excludes from its definition of "debt collector" those "collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity is . . . ***incidental to a bona fide fiduciary obligation.***" 15 U.S.C. § 1692a(6)(F). However, for the fiduciary exception to apply, ECMC must have a "fiduciary obligation" and ECMC's collection activity must be "incidental to" that fiduciary obligation. See Rowe v. Educ. Credit Mgmt. Corp., 559 F.3d 1028, 1032 (9th Cir. 2009).

As the court did in Rowe, Plaintiff will presume that ECMC has a "fiduciary obligation" to DOE as far as its guarantor role is concerned.  However, as the Ninth Circuit aptly noted in Rowe, "But the question is not whether, generally speaking, ECMC is a guaranty agency. Rather, *the question is whether, in this particular case, ECMC was acting as a guaranty agency under the HEA or merely as a collection agent*." Id. at 1032 (emphasis added).

In Rowe, as here, ECMC did not guaranty the loan to Rowe, OSSC rather than ECMC was

11

the guarantor of the loan (here Mr. Manchanda's guarantor was American Student Assistance ("ASA") (SOUMF, ¶¶ 5-6)). Id. at 1035.  Accordingly, in Rowe the court found that ECMC's sole function was to take assignment of the loan from OSSC and to act as a collection agent for them. Id.  Thus, the Ninth Circuit held that *"[s]uch collection activity is not "incidental to" ECMC's fiduciary duty to DOE*" within the meaning of the FDCPA. 15 U.S.C. § 1692a(6)(F)(i).  Similarly, in Brannan v. United Student Aid Funds, Inc., 94 F.3d 1260, 1262-1263 (9th Cir. 1996), the Ninth Circuit held categorically that collection activities of guaranty agencies under the HEA are subject to the FDCPA.  Simply put, if ECMC is nothing more than a debt collector, acting like a debt collector by acquiring delinquent and defaulted student debts, adding collection fees to the balances, and making collection calls to receive payments thereon, then they will be liable as a debt collector. Id.

Here, there is no factual dispute that ECMC is a debt collector whose principal purpose is the collection of any debts and/or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another and thus, any collections efforts with respect to Mr. Manchanda's loans were not incidental to its fiduciary obligation to the DOE. See 15 U.S.C. § 1692a(6).

Although statistics are not available for all years, in 2010, *76% of ECMC's revenue* came from debt collection, where it defaulted delinquent borrowers, particularly those filing bankruptcy, imposed "collection costs," and then rehabilitated the loans, reselling them into the market as federally guaranteed and performing loans, and thereby reaping a windfall from the United States taxpayer for the minimal work involved in helping the distressed and downtrodden out of a catastrophe ECMC purposely created in order to profit from debtor hardships. (SOUMF ¶ 3.) Logically, if over 3/4 of a company's revenue stream is from debt collection, the principal purpose of that company is debt collection.

Additionally, ECMC engages in debt collection rather than debt counseling, as it has powerful financial incentives to do so. (SOUMF ¶ 4.)  As ECMC collects 31 percent, or $7,750 on a $25,000 loan, which is **31 times** more than what they can make if they prevent the default through counseling or **3 times** more than he return investors can expect over a 10-year period investing in the stock market; these fees are earned in **4-5 months, not 10 years.** (SOUMF ¶ 4.)  As such, it is undisputed that debt collection is a profitable business for ECMC and its "principal purpose" is the collection of debts.

### C. FDCPA's Application to ECMC's Collection Acts

Here, there is no factual dispute that ECMC engaged in repeated false, deceptive and misleading representations in connection with the collection of Mr. Manchanda's student loan debt, and thus, summary judgment should be granted on Plaintiff's FDCPA claims.

As stated above, section 1692(e) explicitly outlines sixteen (16) types of representations that amount to per se violations of the FDCPA.  For example, § 1692(e)(4) prevents collectors from falsely representing the potential results of nonpayment of the debt; section 1692(e)(5) prohibits collectors from threatening to take action that is not intended or that amounts to a legal violation of the Act; and section 1692(e)(11) makes it the affirmative duty of the debt collector to "disclose clearly in all communications made to collect a debt or to obtain information about a consumer, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose." See U.S.C.A. §§ 1692(e)(4),(5) and (11).

However, the statutory list pursuant to U.S.C.A. § 1692(e)is not exhaustive. Accordingly, "a debt collection practice can be a 'false, deceptive, or misleading' practice in violation of § 1692e even if it does not fall within any of the subsections of § 1692e." Clomon, 988 F.2d at 1318; Fritz, 955 F. Supp. 2d at 169.

As such, "a debt collector may not communicate with a consumer at any unusual time or

place known, or that should be known, to be inconvenient to the consumer" and "a debt collector may not communicate with a consumer at the consumer's place of employment where on-the-job personal communications are prohibited." 15 U.S.C. § 1692c(a)(1) and (2).  Moreover, the FDCPA also prohibits harassing or abusive communications, 15 U.S.C. § 1692d(1)-(6), and the communication of false or misleading representations in attempting to collect a debt, particularly where these practices improperly take advantage of the debtor and benefit the debt collector. 15 U.S.C. § 1692(e).  Furthermore, contacts with the consumer's relatives, other than the spouse, to collect a debt violate the FDCPA.

Here, not only is the statutory list pursuant to U.S.C.A. § 1692(e) not exhaustive, the list of ECMC's repeated false, deceptive and misleading representations in connection with the collection of Mr. Manchanda's student loan debt is not exhaustive, as well.

First and foremost, the Notice of Default that was dated on or about February 6, 2017 was sent to 82 Beaver Street, Apt. 301, New York, NY 10005, even though Mr. Manchanda lived at 150 W 51st St., Apt. 2106, New York, NY 10019, which was the address ECMC had as Mr. Manchanda's last known address during the collection call on April 14, 2017, which resulted in Mr. Manchanda's loan being rehabilitated. (Plaintiff's Statement of Material Facts ¶ 17.)  Clearly, as the NOD was mailed to a different address than the address ECMC has on file as Mr. Manchanda's residence, the NOD was defective under 34 C.F.R. § 682.410(b)(5)(ii)(A) which has as a condition precedent that proper notification be provided to the consumer ***before charging collection costs or reporting the consumer to a Consumer Reporting Agency***. The applicable regulations so require:

> (ii) The guaranty agency, after it pays a default claim on a loan but ***before it reports the default to a consumer reporting agency or assesses collection costs against a borrower, shall***, within the timeframe specified in paragraph (b)(6)(ii) of this section, ***provide the borrower with –***
>    **(A)** ***Written notice that meets the requirements of paragraph (b)(5)(vi)*** of this

**section regarding the proposed actions;**
  **(B)** ***An opportunity to inspect and copy agency records pertaining to the loan obligation***;
  **(C)** ***An opportunity for an administrative review of the legal enforceability or past-due status of the loan obligation***; and
  **(D)** ***An opportunity to enter into a repayment agreement on terms satisfactory to the agency***.

  34 C.F.R. § 682.410(b)(5)(ii) (emphasis added); (SOUMF Facts ¶ 18.)

Evidently, this was no mere oversight, but a systematic scheme on ECMC's part to saddle indigent consumers experiencing undue financial hardship after exiting bankruptcy with "collection costs" which would result in financial gain to ECMC. (SOUMF ¶ 19.)  Therefore, the NOD was never received by Mr. Manchanda despite the fact his correct address was known to ECMC resulting in Mr. Manchanda never being advised of the potential results of nonpayment of the debt in clear violation of U.S.C.A§ 1692(e)(4).

Moreover, because the Rehabilitation Agreements provided to Mr. Manchanda to DocuSign on April 14, 2017 recited the inflated balance of $161,349.62 and misled Mr. Manchanda into believing he had no choice but to pay the higher loan balance with the ***$36,559.19*** of collection charges, ECMC threatened to take action that amount to a legal violation of U.S.C.A§ 1692(e) because applicable law does not permit the addition of these collection charges in clear violation of U.S.C.A§ 1692(e)(5). (SOUMF ¶ 21.)  The April 14, 2017 Rehabilitation Agreement stated pertinently, "Upon rehabilitation, the outstanding balance of your loan(s), ***including collection costs, will be capitalized.***  The collection costs will be a percentage (not to exceed 16 percent) of the original principal and interest balance at the time of rehabilitation.  (SOUMF ¶ 22.)

However, this is misleading.  In point of fact, 34 C.F.R. § 682.410(b)(2) expressly states that a borrower who rehabilitates a defaulted loan ***will not be responsible for such collection costs.***  The regulation states pertinently:

  (2) Collection charges.

(i) Whether or not provided for in the borrower's promissory note and subject to any limitation on the amount of those costs in that note, the guaranty agency may charge a borrower an amount equal to the reasonable costs incurred by the agency in collecting a loan on which the agency has paid a default or bankruptcy claim *unless, within the 60-day period after the guaranty agency sends the initial notice described in paragraph (b)(6)(ii) of this section, t*he borrower enters into an acceptable repayment agreement, including a rehabilitation agreement, and honors that agreement*, in which case the guaranty agency must not charge a borrower any collection costs*.

34 C.F.R. § 682.410(b)(2).

Clearly, these are false and misleading statements in connection with the collection of a debt which are *per se* violations of the FDCPA. See 15 U.S.C. § 1692(e)(10) (prohibiting deceptive means and false representations used to collect a delinquent debt); See 15 U.S.C. § 1692(e)(4) (prohibiting the deceptive practice of insinuating that nonpayment of the debt will result in seizure of assets or garnishment of wages when the debt collector does not actually intend to engage in such practices, and is simply using such threats to scare the debtor into compliance (i.e., agreeing to $36,559.19 of additional "collection costs" amounting to about 30% of the outstanding debt)); See 15 U.S.C. § 1692 (e)(11) prohibiting a debt collector from posing as a student loan company or otherwise misleading the debtor about who he is really speaking with and the true nature of the interaction and its debt collection purposes). (SOUMF ¶ 24.)

To sum it up, the entire call by Mr. Sarang was in violation of FDCP.  First and foremost, Mr. Sarang called Mr. Manchanda at his home after hours, and knew or at the minimum, should have known that this would have been an inconvenience to the consumer in direct violation of  15 U.S.C. § 1692c(a)(1). (SOUMF ¶ 32.)  Additionally, Mr. Sarang may not communicate with consumers at their place of employment where on-the-job personal communications are prohibited, yet, nonetheless, Mr. Sarang sought Mr. Manchanda's work phone number, address, and other contact details *after* Mr. Manchanda indicated he did not take calls at work in direct

16

violation of  15 U.S.C. § 1692c(a)(2).  (SOUMF ¶ 52.)

Moreover, even though contacts with the consumer's relatives, other than the spouse, are in violation of  the FDCPA, nonetheless, Mr. Sarang asked Mr. Manchanda for contact details for a number of third parties, including Rishi Manchanda and Dr. Sapna Muragali (Mr. Manchanda's ex-girlfriend's Mom of 20-years-ago), and Sara Mandhanda (Mr. Manchanda's Mom). (Plaintiff's Statement of Material Facts ¶ 53.)  Furthermore, the entire interaction with Mr. Sarang was misleading and misrepresented Mr. Manchanda's options. (Plaintiff's Statement of Material Facts ¶ 54.)   Mr. Sarang misrepresented that accepting ***$36,559.19*** in collection costs to "***get out of default***" and to rehabilitate the loan was sold to Mr. Manchanda as his only option, after never having received the "Notice of Default" giving him 60 days to cure, when in fact, ECMC purposely steered Mr. Manchanda down the default/rehabilitation path rather than providing debtor counseling, motivated by the substantial fees ECMC could earn by doing so in direct violation of 15 U.S.C. § 1692d(1)-(6) and 15 U.S.C. § 1692(e).  (SOUMF ¶ 54.)

In addition to advising that rehabilitation of the loan was Mr. Manchanda's only option and inducing Mr. Manchanda into a rehabilitation program, on or about May 7, 2017, ECMC filed a "Notification of Report to Consumer Reporting Agencies" indicating that "[s]ince you did not pay the full balance of your defaulted student loan(s) within 60 days of the notice of default, Educational Credit Management Corporation ("ECMC") has reported the default status to all national consumer reporting agencies, as required by federal regulation." (SOUMF ¶ 36.)  This notification came as a complete shock to Mr. Manchanda, who had just entered into a Rehabilitation Program with ECMC based on Mr. Sarang's representations to prevent his credit from being damaged. (SOUMF ¶ 36.)  Under the applicable regulatory framework, a guaranty agency ***cannot*** report a consumer to a Consumer Reporting Agency or impose collection costs until it provides the borrower with written notice to their last known address:

17

(ii) The guaranty agency, after it pays a default claim on a loan but ***before it reports the default to a consumer reporting agency or assesses collection costs against a borrower, shall***, within the timeframe specified in paragraph (b)(6)(ii) of this section, *provide the borrower with –*

    **(A)** *Written notice that meets the requirements of paragraph (b)(5)(vi)* of this section regarding the proposed actions;

    **(B)** *An opportunity to inspect and copy agency records pertaining to the loan obligation*;

    **(C)** *An opportunity for an administrative review of the legal enforceability or past-due status of the loan obligation*; and

    **(D)** *An opportunity to enter into a repayment agreement on terms satisfactory to the agency*.

34 C.F.R. § 682.410(b)(5)(ii) (emphasis added).

However, ECMC blatantly reported Mr. Manchanda to consumer reporting agencies ***and*** imposed collection costs in the amount of ***$36,559.19*** against him without ever providing written notice to his last known address, which it is undisputed was never done, despite ECMC being fully aware of Mr. Manchanda's last known address during the collection call on April 14, 2017. Therefore, by ECMC filing a "Notification of Report to Consumer Reporting Agencies" on or about May 7, 2017 and by imposing draconian collection costs in the amount of ***$36,559.19*** against Mr. Manchanda without ever providing him written notice, ECMC is in direct violation of 34 C.F.R. § 682.410(b)(5)(ii).

Thus, there is no factual dispute that ECMC engaged in repeated false, deceptive and misleading representations in connection with the collection of Mr. Manchanda's student loan debt, and thus, summary judgment should be granted on Plaintiff's FDCPA claims.

## IV.   CONCLUSION

For the foregoing reasons Plaintiff's Motion Summary Judgment should be granted in addition to such other and further relief as the Court deems just and proper.

Dated: New York New York          FAZZIO LAW OFFICES
      May 25, 2021


                                       s/ *John P. Fazzio*
                                       By: JOHN P. FAZZIO ESQ. (1752)
                                       305 Broadway, 7th Floor
                                       New York, NY 10007
                                       Phone: (201) 529-8024
                                       Fax: (201) 529-8011
                                       Email: jfazzio@fazziolaw.com

                                       *Attorneys for Plaintiff*
                                       *Rahul Manchanda*