UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – –

RAHUL MANCHANDA,

                         Plaintiffs

vs.

NAVIENT STUDENT LOANS &
EDUCATIONAL CREDIT MANAGEMENT
CORPORATION ("ECMC"),

               Defendant/Third-Party
               Plaintiff

(WHP)

Index No.  1:19-cv-05121

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56.1

Plaintiff RAHUL MANCHANDA, by and through his undersigned counsel, and pursuant to Rule 56, Fed.R.Civ.P and Local Rule 56.1, hereby files this Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried In Support of Plaintiff's Motion for Summary Judgment.

### Background

1.      Educational Credit Management Corporation ("ECMC") is a non-profit guaranty agency that participates in the Federal Family Education Loan Program ("FFELP") and is authorized to collect from defaulted borrowers through administrative orders.

### ECMC Collectors Earn Big Money Collecting from Struggling Borrowers Suffering Financial Hardship

2.      ECMC may be a non-profit, but those that work for ECMC make substantial profits by "ruthlessly" collecting against indigent debtors facing extreme financial hardship and misleading

them for financial gain, steering them into a costly "rehabilitation program" that adds 25% to 30% onto the loan balance – which though advertised and sold as "rehabilitative" is actually "punitive." ECMC devotes its resources and awards bonus compensation in tiers, rewarding the debt collectors in its boiler room sales floors for how many student loan debtors they can enroll into the costly "rehabilitation program" rather than helping debtors avoid default or educating debtors on less costly repayment options.  ECMC's entire operation exists almost exclusively to engage in ruthless "debt collection" activities whereby ECMC picks the bones of and preys on the misfortune of defaulted debtors in order to reap huge profits that account for more than 75% of ECMC's annual revenues.

3.      Both ECMC and its employees reap substantial profits from the devastation they cause to the lives and pocketbooks of beleaguered defaulted student loan debtors.  For example, Joshua Mandelman made $454,000 in a single year as a student-loan debt collector for ECMC -- more than twice the pay of the U.S. Secretary of Education. John Hechinger, "Taxpayers fund $454,000 pay for collector chasing student loans," BLOOMBERG NEWS (May 16, 2012).[1] Richard Boyle, chief executive officer of ECMC, received $1.1 million in 2010, including commuting expenses from his ranch in New Mexico. Id. Five other managers each took home more than $400,000. Id.  As Hechinger put it in his article:

> **The company charges fees to borrowers and earns commissions from taxpayers -- totaling as much as 31 percent -- when it collects on defaulted student loans. Those rich rewards, which are approved by Congress, are sparking criticism that ECMC and similar collection agencies are reaping a bonanza from former students' pain.**

Id.  CEO Richard Boyle -- a former executive with SLM Corp., the largest U.S. student-loan company, known as Sallie Mae -- received $271,000 in 2002. Id. His compensation rose to $618,000

---

[1] Available at https://www.telegram.com/article/20120516/NEWS/305169924.

in 2004, $852,000 in 2008 and $1.1 million in 2010, making him the highest-paid head of a guaranty agency. Id.

4.      Under government rules, guaranty agencies add collection costs -- currently as much as 25 percent -- to a borrower's loan balance[2]. Hechinger Article, *passim*.[3] They also keep 16 percent of any money recovered. Id. If an agency "rehabilitates" a loan -- getting borrowers to make nine payments in 10 months -- it gets a jackpot. Id.  By law, the organizations can receive as much as 37 percent of a borrower's entire loan amount, half in collection costs and half in taxpayer-funded commissions[4]. Id. However, the key to this strategy of getting maximum collection costs is that ECMC must wait for 60 days after a Notice of Default is served to become statutorily entitled to these "collection costs," and then only after formally Defaulting the borrower (and ruining their credit in the process), will ECMC assist with rehabilitation of the loan. Id.  Certainly, ECMC could just as easily counsel the borrower on how to avoid default in the first place – but, this is not very profitable. Id.  Statistics are not available for all years, but in 2010, 76% of ECMC's revenue came from debt collection, where it defaulted delinquent borrowers, particularly those filing bankruptcy, imposed "collection costs," and then rehabilitated the loans, reselling them into the market as federally guaranteed and performing loans, and thereby reaping a windfall from the United States

---

[2] The Higher Education Act ("HEA") states that "a borrower who has defaulted on a loan . . . shall be required to pay . . . reasonable collection costs." 20 U.S.C. § 1091a(b)(1).

[3] Available at https://www.telegram.com/article/20120516/NEWS/305169924.

[4] When a guaranty agency sells a defaulted loan that has been rehabilitated, the HEA states that "the guaranty agency . . . may, in order to defray collection costs . . . charge to the borrower an amount not to exceed 18.5 percent of the outstanding principal and interest at the time of the loan sale." 20 U.S.C. § 1078-6(a)(1)(D). *See also* Bates No.: 107, which while only the 1st page of the Note is attached, the 3rd page, which is omitted, states, pertinently at Section 28(A) that "these costs…in the case of [federal] loans in default, held by a guaranty agency, may not exceed 18.5 percent of the outstanding principal and interest on the loan at the time the holders certify the payoff amounts."  Effective July 1, 2014, the HEA was amended to reduce the rate of collection costs from 18.5 percent to 16 percent of the principal and interest outstanding. Joint Resolution, Pub. L. 113-67, § 501(2), 127 Stat. 1165, 1187 (2013). The HEA further provides that, if the rehabilitated loan is transferred to DOE rather than to an eligible lender, "the guaranty agency shall add to the principal and interest outstanding at the time of the assignment of such loan an amount equal to [the assessed collection costs]." 20 U.S.C. § 1078-6(a)(1)(E) (2014).

taxpayer for the minimal work involved in helping the distressed and downtrodden out of a catastrophe ECMC purposely created in order to profit from debtor hardships. Id. A side benefit is leaving the beleaguered student loan debtor with 130% as much debt as he started with, and already couldn't pay, resigning the individual to debt slavery for life. Id.

5.       ECMC has powerful financial incentives to engage in debt collection rather than debt counseling.  ECMC says it typically collects 31 percent, or $7,750 on a $25,000 loan. Id. That's 31 times what it can make for preventing the default through counseling and about 3 times the return investors can expect over a 10-year period investing in the stock market, and those fees are earned in 4-5 months, not 10 years. Id. Certainly, debt collection is a profitable business for ECMC. Id. In 2010, ECMC generated $131 million from debt collection, or about three quarters of its revenue. Id.

6.       Thus, ECMC's "principal purpose" is the collection of debts, and it behaves as such. Were ECMC truly acting in accord with fiduciary duties to the Department of Education ("DOE"), to the United States Government at large and to the taxpayer, its revenues would be earned from counseling debtors facing severe economic hardships on options to avoid default through Loan Rehabilitation, Loan Consolidation and Income-Based Repayment, thereby avoiding the necessity of having the government front the collection costs, which as will be explained herein, are engineered by ECMC solely for profit, and constitute a windfall or unjust enrichment earned off the backs of unwitting debtors ensnared by ECMC's scheme for profiting off the misfortunes of others.

### Plaintiff Rahul Manchanda's Loan and ECMC's Debt Collection Activities and Deceptive Trade Practices

7.       On May 1, 2003, Plaintiff Rahul Manchanda, as Borrower, signed a Federal Consolidated Loan Application and Promissory Note with College Loan Corporation ("CLC") for student loans made under FFELP, which had a guaranty by American Student Assistances ("ASA").

4

Bates No.: 0000107.  The principal balance of the loan was $118,805.67 with a fixed interest rate of 4.625%. Id.

8.      Manchanda's student loans became due on October 14, 2003. Bates Nos.: 000074-000080.  Manchanda paid the loan timely for 94 months and paid a total of $56,034.65, although these payments only covered the interest on the loan and barely made a dent in the principal. Id.

9.      On March 14, 2014, after utilizing all 31 months of available forbearance during periods of economic downturn (i.e., in 2008-2010), Plaintiff Manchanda missed the March payment and became delinquent. Id.  At this time, Mr. Manchanda was suffering an economic hardship and was unable to pay his bills as they came due, including his student loan payments.

10.      On April 30, 2014, Plaintiff Manchanda filed a Ch. 13 Bankruptcy under Docket No.: 14-11259 (ALG). Bates Nos.: 000074-000080, 000081-000086, 000108-000110.

11.      On June 3, 2014, ASA filed a Proof of Claim "for CLC… On behalf of MHEAC d/b/a ASA" in the amount of $113,506.79 for the defaulted student loan. (Ex. X to Fazzio Decl., Pgs. 1-2).

12.      As a result of Manchanda's bankruptcy, ASA paid a bankruptcy claim on July 6, 2014, in the amount of $114,489, which included interest accrued after the claim date.   Id. Defendant ECMC's representative, Pamela Smith, responded to Plaintiff Manchanda's CFPB Complaint with a detailed explanation of this loan history with ASA as the guarantor at the time of delinquency, default and bankruptcy filing. Bates Nos.: 000074-000080.[5]

---

[5] The convoluted history of the bankruptcy filings and loan transfers is as follows: Due to the bankruptcy filing, ASA transferred all rights, title and interest of the loan to ECMC on July 10, 2014, and ECMC acquired the defaulted debt by way of assignment.  On July 15, 2014, ASA sent a Notice that ECMC had taken over Plaintiff's loan. Bates Nos.: 000081-000086, 000108-000110. On July 6th, 2014, the default claim was forwarded and assigned to ECMC.  Bates Stamp. 000046-000047.  As Pamela Smith noted, the default and subsequent transfer was based on Plaintiff Manchanda's delinquency and prompted by his bankruptcy filing. Bates Nos.: 000074-000080. On January 7, 2015, Plaintiff's Ch. 13 Bankruptcy under Docket No.: 14-11259 (ALG) was voluntarily dismissed on the Order of the Honorable Allan L. Gropper, U.S.B.J. Bates Nos.: 000082-000085. Second BK Dismissal 000082-000086 on the Order of the Honorable James L. Garrity, Jr., U.S.B.J., which Order was entered on January 27, 2017.

13.     Prominent in those facts was the clear delineation of ASA – not ECMC – as the guarantor who paid out the claim after the original default on Manchada's loan.  Id.  Ms. Smith explained clearly that "the loan was … originally **guaranteed by American Student Assistance** ("ASA")" and "**ASA paid a bankruptcy claim**… of $114,489" and "[d]ue to the bankruptcy filing, **ASA transferred all right, title and interest of the loan to ECMC …**" Id.  In other words, Manchada's delinquent loan was in default and subject to a bankruptcy filing, leaving absolutely no question of its distressed character.

14.     At this point ECMC received assignment of the loan for the "principal purpose" of engaging in "debt collection" activity.  In order to collect on Mr. Manchada's defaulted student loan, ECMC went on to take the steps of formally declaring the default and informing the debtor of his rights (which was deceptively and deficiently done by sending the notification to the **wrong address**, cheating the borrower out of advanced warning of exorbitant "collection costs" and depriving him of fair legal process under the regulations), adding collection costs (to the extent authorized by 34 C.F.R. § 682.410(b)(2), which is allowable only **after providing the requisite notice to the correct address**), and engaging in debt collection, including but not limited to by enrolling the borrower in rehabilitation (and offering alternatives of providing a repayment plan or administering an administrative wage garnishment).  Id.

15.     It is very clear that ASA was the guarantor on the loan and ECMC stepped-in strictly as a "debt collector."  Id.  Ms. Smith explains that ECMC sold the loan back to ACS in 2015 for $117,808.98 when Manchada came out of bankruptcy, but the loan went back into default and ACS filed a claim against ECMC wherein ECMC allegedly paid $124,790.43 for the default and **the "account was placed for collections."** Id. (Emphasis added).

16.     The simple explanation for the ping-pong with regard to ECMC taking over the loan, selling it back to ACS, and then taking re-assignment of it is that ECMC does not collect on loans that are in bankruptcy (Bates Nos.: 00001-000018, *see* Pg. 4, Para. 6-7), but rather only "collects" once a bankruptcy ends, and as a "debt collector" whose "principal purpose" is the collection of debts, ECMC does not administer uncollectible debts that are covered by the automatic stay.  The relevant portion of ECMC's Guaranty Agreement with the DOE states at Paragraph 7: "7. Post-Bankruptcy Collections. When administering loans on which a borrower has filed a petition for relief under the U.S. Bankruptcy Code, ***in instances where the bankruptcy case concluded and the loans were in default at the time the borrower filed bankruptcy***, **the loans shall be assigned** by ECMC/the Federal Services Bureau **to ECMC/the Guarantor** *for post-default collections*."

17.     As these facts, and the agreements between ECMC and the DOE plainly show, ECMC never administered Plaintiff's loan in a fiduciary capacity at any relevant time, but rather acted as a "debt collector" tasked with "post-default collections" at all relevant times. Id.

18.     On February 6, 2017, ECMC allegedly sent Plaintiff a Notice of Default ("NOD") noting that ***"collection costs of up to 23.4% [would be] added to [the] loan pursuant to federal regulations"*** if the loan balance was not paid off within 60 days or by April 7, 2017. Bates No.: 000066-000069.  The NOD was addressed to the knowingly incorrect address of "82 Beaver Street, Apt. 301, New York, NY 10005." Bates No.: 000066 [Address Block in Upper Left-Hand Corner]. This was ***not*** Mr. Manchanda's address at that time, which was known to ECMC.

19.     On February 6, 2017, Mr. Manchanda lived at 150 W 51st St., Apt. 2106, New York, NY 10019. (See, e.g., Bates No.: 000072). This was the address ECMC had on file as Mr. Manchanda's last known address during the collection call on April 14, 2017, which resulted in Mr. Manchanda's loan being rehabilitated.  The Audio Transcript states pertinently:

        **Mr. Sarang:** [00:00:48] Yeah, that's actually one of the reasons why I was

7

actually contacting you. How's your Friday coming along so far? It's going it's getting there slowly but surely not a problem. All right, so really quickly, **I just wanted to make sure that the information we have for you is still correct. I have. Let's see here. Is it 150 West 51st apartment, 2106? Yep. New York, NY**. Oh, say it again, suite number,

**Rahul Manchanda:** [00:01:16] Yes, if you want to say. **That's right, yes.  2106**.

**Mr. Sarang:** [00:01:18] Oh, OK. I got you. **No worries. No worries. I got a New York New York 10019.** And then I have your home phone is these six four six six four five zero nine nine three. Is that correct as well?

(Audio Transcript :48 to 1:18).  This was also the address to which all later correspondence from ECMC was addressed. (See, e.g., Bates No.: 000072). The correct address was known to ECMC and was the address "[ECMC] [had on file] for [Mr. Manchanda]." Id.  However, the NOD was intentionally mailed to a different address.  On information and belief, this was done purposely to deprive Mr. Manchanda of fair warning that "collection costs" would be imposed if action was not taken and to deceptively steer Mr. Manchanda into its "rehabilitation program."  This prejudiced Mr. Manchanda's rights to *avoid default* and *avoid collection costs*, and locked-in ECMC's ability to earn the exorbitant $36,559.19 of "collection costs" and for Mr. Sarang to earn his monthly bonuses and commissions. The applicable statutes and regulations prohibit collection costs from being imposed until fair warning is provided by way of a valid NOD being provided to the borrower at their last known address.

20.     Thus, the NOD was defective under 34 C.F.R. § 682.410(b)(5)(ii)(A) which has as a condition precedent that proper notification be provided to the consumer ***before charging collection costs or reporting the consumer to a Consumer Reporting Agency***. The applicable regulations so require:

> (ii) The guaranty agency, after it pays a default claim on a loan but ***before it reports the default to a consumer reporting agency or assesses collection costs against a borrower, shall***, within the timeframe specified in paragraph (b)(6)(ii) of this section, ***provide the borrower with –***
> (A) *Written notice that meets the requirements of paragraph (b)(5)(vi)* of

8

this section regarding the proposed actions;
    **(B) *An opportunity to inspect and copy agency records pertaining to the loan obligation*;**
    **(C) *An opportunity for an administrative review of the legal enforceability or past-due status of the loan obligation*; and**
    **(D) *An opportunity to enter into a repayment agreement on terms satisfactory to the agency*.**

34 C.F.R. § 682.410(b)(5)(ii).

21.    On information and belief, this was no mere oversight, but a scheme by ECMC to harm consumers already experiencing undue financial hardship after exiting bankruptcy by deceptively charging them "collection costs" which would result in a financial windfall for ECMC and its employees, despite deceptively depriving the debtor of fair warning and notice of their rights. On information and belief, making all reasonable inferences that can be made from the facts on record, ***ECMC purposely sent the NOD to the wrong address.***

22.    Without question, the NOD was never received by Mr. Manchanda despite the fact his correct address was known to ECMC as evidenced by the fact that they continued to contact him at his new address and telephone numbers and had verified his new address countless times, prior. (See Para 17 above).

23.    Despite failing to provide the NOD required by regulation 34 C.F.R. § 682.410(b)(5)(ii)(A), which would have advised Mr. Manchanda of his options to prevent "collection costs" from accruing, the paperwork ultimately presented to Mr. Manchanda to avert this disaster already had the collection costs of 23.4% added-in, increasing the loan balance from $124,790.43 to $161,349.62 or increasing the total loan balance by a whopping 130%. Bates Nos. 000019-000030.

24.    Because the Rehabilitation Agreements provided to Mr. Manchanda to DocuSign on April 14, 2017 recited the inflated balance of $161,349.62, ECMC deceptively trapped Mr. Manchanda in a Hobson's Dilemma and falsely advertised the rehabilitation program as the only

conceivable way forward, misleading Mr. Manchanda into believing he had no choice but to pay the higher loan balance with the $36,559.19 of additional charges, thereby engaging in deceptive business practices, because applicable law does not permit the addition of these collection charges if notice is not properly given, if the loan is timely rehabilitated or consolidated in time, or if a qualifying repayment plan is entered into, and therefore does not require a debtor to agree to the "collection costs" as a condition of rehabilitating their defaulted loan. Bates Nos. 000019-000030.

25.     The April 14, 2017 Rehabilitation Agreement stated pertinently, "Upon rehabilitation, the outstanding balance of your loan(s), ***including collection costs, will be capitalized.*** The collection costs will be a percentage (not to exceed 16 percent) of the original principal and interest balance at the time of rehabilitation. Collection costs are determined pursuant to federal regulations. See 34 C.F.R. § 682.410(b)(2)." (Emphasis added).

26.     This is misleading. In point of fact, 34 C.F.R. § 682.410(b)(2) expressly states that a borrower who rehabilitates a defaulted loan ***will not be responsible for such collection costs (if action is taken within 60-days of notice).*** The regulation states pertinently:

>       (2) Collection charges.

>       (i) Whether or not provided for in the borrower's promissory note and subject to any limitation on the amount of those costs in that note, the guaranty agency may charge a borrower an amount equal to the reasonable costs incurred by the agency in collecting a loan on which the agency has paid a default or bankruptcy claim ***unless, within the 60-day period after the guaranty agency sends the initial notice described in paragraph (b)(6)(ii) of this section, the borrower enters into an acceptable repayment agreement, including a rehabilitation agreement, and honors that agreement, in which case the guaranty agency must not charge a borrower any collection costs.***

34 C.F.R. § 682.410(b)(2).

27.     In conjunction with the "sewer service" of the NOD, these are false or misleading statements in connection with the collection of a debt which are *per se* violations of the FDCPA. See 15 U.S.C. § 1692(e) ((e)(10) prohibits deceptive means and false representations used to collect

a delinquent debt, (e)(4) prohibits the deceptive practice of insinuating that nonpayment of the debt will result in seizure of assets or garnishment of wages when the debt collector does not actually intend to engage in such practices, and is simply using such threats to scare the debtor into compliance (i.e., agreeing to $36,559.19 of additional "collection costs" amounting to about 30% of the outstanding debt to "avoid garnishment" as the opening salvo of the collection call explained), and (e)(11) prohibits a debt collector from posing as a student loan company or otherwise misleading the debtor about who he is really speaking with and the true nature of the interaction and its debt collection purposes).

28.      A Notice of Default was ***allegedly*** issued on February 6, 2017, stating that "As a result of your failure to meet your federal student loan repayment obligation, Educational Credit Management Corporation ("ECMC"), as guarantor of your loan(s), ***was required to pay a default claim to your lender and take assignment of your loan(s) as shown in Attachment B***.  Your total payment amount as of the date of this letter is $128693.44."  Bates Nos.: 000066-000069. (Emphasis added).  The Notice of Default advised that a consequence of Default was that "Collection costs of up to 24.34% (subject to change) added to your loan, pursuant to federal regulations." Id.  On the 2nd Page of the Notice of Default, it states that after 9 on-time payments in a 10-month period, "Your new lender will capitalize any outstanding interest and collection costs (capped at 16%) to your principal balance." Id. The Notice of Default indicates that "important information about interest accrual, collection costs, and your rights is included in Attachment A." Id.

29.      Buried in the fine print of Attachment A, the Notice of Default further states, "**Collection costs.**  Sixty days after the date of this letter, pursuant to 20 U.S.C. § 1091(a)(b) and 34 C.F.R. § 682.410(b)(2), you will be assessed collection costs on your delinquent loan(s).  These collection costs may be substantial and will be a percentage of your principal balance based on either the percentage calculated annually under the formula in 34 C.F.R. § 30.60 or the amount you

11

would be charged if your loan(s) was held by the U.S. Department of Education."

*30.*      Unfortunately, ***Mr. Manchanda never received the NOD since it was sent to the wrong address.***

31.      April 7, 2017 marked the end of the Sixty-Day window in which Mr. Manchanda's loan could have been rehabilitated under 34 C.F.R. § 682.410(b)(2) without incurring $36,559.19 of additional "collection costs" amounting to about 30% of the outstanding debt.  Between February 6, 2017 and April 7, 2017, ECMC maintained radio silence and failed to contact Mr. Manchanda at all, let alone to advise him of his rights to rehabilitate his loan during this critical period before he would be on the hook for 130% of the original balance.  In fact, ECMC waited a full additional week for good measure, ensuring its entitlement to "collection costs" under 34 C.F.R. § 682.410(b)(2) was firmly established, before ***first*** reaching out and ***first*** making contact to Mr. Manchanda to address the delinquency on his loan.  **Note**: ***Mr. Manchanda actually proactively and of his own accord reached out to ECMC (on March 9, 2017 among other times), but they did not return his calls or provide guidance on what to do to avoid default – even though Mr. Manchanda affirmatively inquired about his options.***  Bates Stamp Nos.: 000036-000037, wherein the log includes a March 9, 2017 inquiry by Mr. Manchanda asking for a "payment arrangement or offer in compromise for a lump sum." Id.

32.      On April 14, 2017, ECMC Agent Mithun Sarang called Mr. Manchanda at his home after hours and convinced him to enter into a Rehabilitation Agreement to avoid further collection activity, which included an affirmation of the new debt balance of $161,349.62 (which included the collection costs of $36,559.19 which were added to the loan). Bates Nos. 000019-000030.  During the call with Mr. Mithun Sarang he advised Mr. Manchanda that the collection costs were "an unavoidable consequence of default" stating that "this is just what happens when you default."

33.      During the collection call, ECMC Agent Mithun Sarang started the conversation by

saying he was calling "**about your defaulted federal student loans… <mark>to give you options of avoiding any future wage garnishments.</mark>**" Audio Recording at :30. (Emphasis added).  Mr. Sarang promptly impermissibly asked for information to contact Mr. Manchanda at work, impermissibly asked for his work phone number, and impermissibly asked if ECMC could auto-dial Mr. Manchanda at work, and confirmed the address for his employer, which had obviously never changed for 20 years. Audio Recording at 1:30-2:15.

34.     Mr. Sarang then proceeded to claim to be presenting Mr. Manchanda with "all his options" and almost immediately broke the news that the loan balance was now $161,349.62 and *not* the $128,693.44 stated in the Notice of Default.  Audio Recording at 3:00.  Mr. Sarang stated, "**<mark>the current balance is $161,349.62</mark>**, do you have the ability or resources Rahul to pay that amount in full?" Audio Recording at 3:17-3:23. Rahul responded with shock, "**<mark>Wait… $161 or $125, I thought it was $125…</mark>**". Audio Recording at 3:28. Mr. Sarang responded, "**<mark>No, I got it at $161,349.62.</mark>**" Audio Recording at 3:31. Mr. Manchanda responded, "**<mark>That's wrong, that's got to be wrong, I even got a letter from ECMC….</mark>**" Audio Recording at 3:33. Mr. Sarang then clarified, "Your principal is $124,790 and then so, **<mark>collection costs were applied here as well</mark>** and that's probably the differential that you're looking in reference to." Audio Recording at 3:36-3:47. (Emphasis added). Mr. Manchanda then said, "**<mark>So it's $40,000 in collection costs?</mark>**" Audio Recording at 3:48. (Emphasis added). Then, Mr. Sarang paused and started going through the numbers, but his computer "lagged" and then he gave the breakdown as follows: "Alright, so your principal balance … is $124,790.43, the interest is $4,977.52, **<mark>the collection costs are $31,580.67.</mark>**" Audio Recording at 3:48-4:28. (Emphasis added). Mr. Manchanda responded by saying, "**<mark>Woah, Woah!</mark>**" Audio Recording at 4:28-4:30. (Emphasis added). Then, Mr. Sarang said, "**<mark>Correct, That's what happens when you get in default…</mark>**" Audio Recording at 4:30-4:32. (Emphasis added). As Mr. Sarang was starting his pitch about the Rehabilitation Program, Mr. Manchanda again protested

13

about the default and the addition of collection costs, saying, "***I mean 30 grand, why 30 grand in collection costs, I mean I didn't sign up for that.  Who defaulted my loan, you guys, that's crazy.***" Audio Recording at 7:38-7:48. (Emphasis added). Mr. Sarang responded, "***Well, that's what happens when you get in default…***" Audio Recording at 7:48-7:51. (Emphasis added). Mr. Manchanda said, "***Really, really…***" Audio Recording at 7:52-7:53. Mr. Sarang responded, "***Trust me, I get it…***" Audio Recordings at 7:54-7:58.

35.      Shortly thereafter, Mr. Sarang provided the solution to the problem ECMC caused by placing Mr. Manchanda in default and charging him $31,580.67 in additional collection charges and interest for a total of a $36,559.19 upcharge on a loan Mr. Manchanda already could not afford. Mr. Sarang stated, "With the information that you are providing me right now, I'm able to give you monthly payments at $5 on a monthly basis.  And you're like, what's $5 gonna do?  I get it.  ***It's gonna get you out of default.  So as long as you can show us that you're gonna be able make 9 out of 10 on-time monthly payments, you're gonna go ahead and get yourself out of default***, at which time you're gonna be eligible for deferments, forbearances, financial aid, any negative credit reporting of the default requested to be removed after 45-days as well, because I'm pretty sure this is affecting your credit report very negatively right now.  And just by making the $5 payments you're gonna get yourself out of default, at which point in time, ***finally when you do get out of default, you can say hey, originally my principal balance was $125,000, I was placed in a default, and I'm disputing the collection costs on behalf of the account***, so there's multiple avenues you'd like to take, but I'm a big believe that knowing is half the battle… you know what I mean." Audio Recording 8:20-9:19. (Emphasis added). Mr. Manchanda then asked the operative question, "***I appreciate that, would that take off the collection costs?  Would that take off the collection costs to or just the default?***" Audio Recording 9:19-9:24. (Emphasis added). Mr. Sarang dodged this question and said he couldn't advise on that, but once Mr. Manchanda got "out of default" he could

14

"contest it" with the new lender. 9:55-10:03.

36.     On May 7, 2017, ECMC filed a "Notification of Report to Consumer Reporting Agencies" indicating that "[s]ince you did not pay the full balance of your defaulted student loan(s) within 60 days of the notice of default, Educational Credit Management Corporation ("ECMC") has reported the default status to all national consumer reporting agencies, as required by federal regulation." Bates No.: 000072.  This. Notification was violative of 34 C.F.R. § 682.410(b)(5)(ii), because credit reporting can only occur after a proper NOD is provided to a correct address. This notification also came as a complete shock to Mr. Manchanda, who had just entered into a Rehabilitation Program with ECMC to prevent his credit from being damaged.

37.     Under the applicable regulatory framework, a guaranty agency cannot report a consumer to a Consumer Reporting Agency or impose collection costs until it provides the borrower with written notice provided to their last known address and then waited the requisite 60 days:

> (ii) The guaranty agency, after it pays a default claim on a loan but *__before it reports the default to a consumer reporting agency or assesses collection costs against a borrower, shall__*, within the timeframe specified in paragraph (b)(6)(ii) of this section, *__provide the borrower with –__*
>      **(A)** *__Written notice that meets the requirements of paragraph (b)(5)(vi)__* of this section regarding the proposed actions;
>      **(B)** *__An opportunity to inspect and copy agency records pertaining to the loan obligation__*;
>      **(C)** *__An opportunity for an administrative review of the legal enforceability or past-due status of the loan obligation__*; and
>      **(D)** *__An opportunity to enter into a repayment agreement on terms satisfactory to the agency__*.

34 C.F.R. § 682.410(b)(5)(ii).

38.     On May 30, 2017, Plaintiff made a report to the Consumer Financial Protection Bureau ("CFPB") complaining that a $30,000 to $40,000 collection fee was illegally added on to Plaintiff's loan.  Bates Nos: 000074-000080.

39.     ECMC used a team of collections employees and supervisors in a "boiler room"

setting who were incentivized by commissions and bonuses which made up more than half their pay for booking "collection costs" of 25%-30% against unwitting defaulted student loan debtors and enrolling the defaulted student debtors into its "rehabilitation program" which it falsely advertised by not providing debtors with honest information about their options, in particular, with regard to avoiding collection costs altogether. <u>Sarang Deposition</u>, Pgs. 33-34. (Q: How much was the percentage that you would receive in bonuses and commissions, the exact percentage for a successful enrollment of an individual into your rehabilitation program, was it a set amount percentage? A: There is a structure, there is a commission structure. **<u>You had to make sure that you collected a certain amount of student loans in order for you to actually be in the tier, so there is different tiers…. Q; Can you define what a tier is?.. <mark>*A tier three, if you had a great month. It's just like a care salesman, you sell two cars, you get this, you sell four cars, you get that, do you know what I mean?  It's the same instance.*</mark></u>**" (Pg. 23, lns. 23-25, Pg. 24, lns. 5-25).

40.     ECMC used a collections employee who was previously arrested and convicted for alcohol related crimes such as a DUI and who sounded inebriated or drunk while contracting Plaintiff and discussed his drinking habits on the call. <u>Sarang Transcript</u>, Pgs. 74-75 ("For drinking while under the influence… alcohol.  Were you convicted?  Yes." (Pg. 74, lns. 15-24), "I had to do a, go to DUI school and go through – what is it called?  The breathalyzer in your vehicle.  I had a breathalyzer in my vehicle and had to go through a 18 month program. (Pg. 74, lns 3-8)."

41.     ECMC used a collections employee who forced Plaintiff to "Docu-Sign" the "rehabilitation contract" twice in one evening, within 20 minutes apart, and on information and belief the first version (different from that included in discovery) differed in the amount, in a further attempt to deceive Mr. Manchanda into accepting ECMC's "collection costs."

42.     ECMC used a collection employee who was never trained in either the Higher Education Act, the Fair Debt Collection Practices Act, and was instead picked from a previous

collections job at Superlative RM (who self-described himself as a "used car salesman") wherein he was used to collect on "pay day loans," "overdue credit cards," and other unsavory debts, and while at ECMC where he was awarded a "cut of the profits" of all the innocent student loan debtors that he managed to deceptively ensnare into ECMC's deceitful "rehabilitation program." Sarang Deposition, Pgs. 18-19.

43.     ECMC used a collections employee who repeatedly refused to answer questions pertaining to the actual debt owed, and when Plaintiff repeatedly questioned why he kept saying $161,000 owed and not approximately $125,000 owed, the ECMC collection employee merely: (a) changed the subject; (b) avoided the question; (c) asked Plaintiff about his race/ethnicity; (d) mocked the spelling and pronunciation of Plaintiff's relatives names; (e) inappropriately asked if he could come visit Plaintiff in New York or would Plaintiff like to come visit him in California, and (f) other inane and obvious diversions designed to either not answer the question, not explain the missing "Notice of Default," or change the subject entirely. Sarang Deposition, *passim.*

44.     ECMC used a collections employee who not only had access to Plaintiff's current address and phone number on screen while speaking with him, but was also in close contact with others (not less than 10) or himself had access to the ability to "toggle" or look up Plaintiff's previous address where the "Notice of Default" was supposedly sent. Sarang Deposition, Pg. 13.

### ECMC Ruthless Collection Activities Against Borrowers Suffering Financial Hardship and Who Are Seeking Bankruptcy Protection

45.     On January 1, 2014, The New York Times published an article highlighting the ECMC's ruthlessness against those seeking bankruptcy protection.  Natalie Kitroeff, Loan Monitor Is Accused of Ruthless Tactics on Student Debt, N.Y. TIMES (Jan. 1, 2014)[6].  It is widely reported

---

[6] Available at https://www.nytimes.com/2014/01/02/us/loan-monitor-is-accused-of-ruthless-tactics-on-student-debt.html?pagewanted=1&_r=1.

that the Department of Education ("DOE") has chosen to instruct its contractor ECMC to pursue highly aggressive and costly litigation tactics even against the poorest borrowers seeking bankruptcy relief. Id.  Thus, in the Schaffer case, for example, ECMC pursued Ms. Schaffer into bankruptcy court and argued she wasn't entitled to a discharge because they accused her of spending too much money on dining out when she paid $12 at McDonald's for some food a few times a month that she split with her husband. Id.

46.     Even though, at the age of 54, she was the sole provider, since her husband Ron was unable to work due to advanced Hepatitis C, diabetes and liver cancer, requiring her to care for Ron before and after work, and although she was working starting at 4:00 am each day in a security guard role, her discharge was challenged because she would occasionally buy a $12 value meal at McDonalds for dinner. Id.  Ms. Schaffer said: "I was taking care of Ron and working a full-time job, so lots of times I didn't have time to fix dinner, or I was just too darn tired." Id.

47.     In a similar fashion, ECMC opposed bankruptcy relief for Janet Roth, an elderly woman with chronic health problems who was living on Social Security income of only $774 a month. Roth v. Educational Credit Management Corporation, 490 B.R. 908 (9th Cir. BAP 2013).

48.     ECMC has been controversial for its "ruthless" tactics in collecting on loans, even in bankruptcy court, and for the large bonuses it paid its collectors for debt collection activities.

### Plaintiff Rahul Manchanda's FDCPA Claim

49.     ECMC is a debt collector under the FDCPA. (Compl. ¶¶ 93-95.). As relevant here, the FDCPA defines a "debt collector" as "any person . . . who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6).  There is no question and no dispute that Defendant "regularly collects or attempts to collect" debts "asserted to be owed or due another."

50.     A financial institution which purchases delinquent debts is a "debt collector" within

18

the meaning of the FDCPA with respect to the delinquent debts. <u>Schlosser v. Fairbanks Capital Corp.</u>, 323 F.3d 534 (7th Cir. 2003); <u>Kimber v. Federal Financial Corp.</u>, 668 F.Supp. 1480 (M.D.Ala. 1987); <u>Cirkot v. Diversified Systems</u>, 839 F.Supp. 941 (D.Conn. 1993); <u>Holmes v. Telecredit Service Corp.</u>, 736 F.Supp. 1289, 1292 (D.Del. 1990).

51.     Under the FDCPA, the terms "debt collector" and "creditor" are mutually exclusive.  To distinguish between these two possibilities, the Act uses the status of the debt at the time of the assignment:

> "(6) The term "debt collector" means any person who . . . regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. . . . The term does not include —
>
>  (F) any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . (iii) ***concerns a debt which was not in default at the time it was obtained by such person.***"
>
>  15 U.S.C. § 1692a (emphasis added).

52.     In other words, the Act treats assignees <u>as debt collectors</u> *if* the debt sought to be collected ***<u>was in default when acquired by the assignee</u>***, and <u>as creditors</u> *if* it was not. <u>See</u> <u>Bailey v. Security Nat'l Servicing Corp.</u>, 154 F.3d 384, 387 (7th Cir. 1998); <u>Whitaker v. Ameritech Corp.</u>, 129 F.3d 952, 958 (7th Cir. 1997); see also <u>Pollice v. Nat'l Tax Funding, L.P.</u>, 225 F.3d 379, 403-04 (3d Cir. 2000); <u>Wadlington v. Credit Acceptance Corp.</u>, 76 F.3d 103, 106-07 (6th Cir. 1996); <u>Perry v. Stewart Title Co.</u>, 756 F.2d 1197, 1208 (5th Cir. 1985).  Here, it is absolutely clear that Manchanda's loan was deemed to be in default and delinquent as of July 6, 2014. Bates Nos.: 000074-000080.  Ms. Smith explained that "the loan was … originally ***guaranteed by American Student Assistance*** ("ASA")" and "***ASA paid a bankruptcy claim***… of $114,489" and "[d]ue to the bankruptcy filing, ***ASA transferred all right, title and interest of the loan to ECMC …***" <u>Id.</u>

53.     As noted in Paragraph 7-8 above, Manchanda's loan went into default on July 6th, 2014, when a bankruptcy claim was made, ***after which*** ASA transferred all rights, title and interest

of the loan to ECMC on July 10, 2014 and ECMC acquired the defaulted loan.  On July 15, 2014, ASA sent a Notice that ECMC had taken over Plaintiff's loan. Bates Nos.: 000081-000086, 000108-000110.

54.     ECMC relies on the fact that the FDCPA excludes from its definition of "debt collector" those "collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity is . . . ***incidental to a bona fide fiduciary obligation.***" 15 U.S.C. § 1692a(6)(F).

55.     For the fiduciary exception to apply, Defendant must have a "fiduciary obligation" and Defendant's collection activity must be "incidental to" that fiduciary obligation. Rowe v. Educ. Credit Mgmt. Corp., 559 F.3d 1028, 1032 (9th Cir. 2009).  As the court did in Rowe, we will presume that Defendant has a "fiduciary obligation" to DOE as far as its guarantor role is concerned. However, as the Ninth Circuit aptly noted in Rowe, "But the question is not whether, generally speaking, ECMC is a guaranty agency. Rather, the question is whether, in this particular case, ECMC was acting as a guaranty agency under the HEA or merely as a collection agent." Id. at 1032.

56.     In *Rowe*, as here, ECMC did not guaranty the loan to Rowe, OSSC rather than ECMC was the guarantor of the loan (here Manchanda's guarantor was American Student Assistance ("ASA") (SOUMF, ¶¶ 5-6)). Id. at 1035.  Accordingly, in Rowe the court found that ECMC's sole function was to take assignment of the loan from OSSC and to act as a collection agent for them. Id.  The Ninth Circuit held that "[s]uch collection activity is not "incidental to" ECMC's fiduciary duty to DOE" within the meaning of the FDCPA. 15 U.S.C. § 1692a(6)(F)(i). Id. In Brannan v. United Student Aid Funds, Inc., 94 F.3d 1260, 1262-1263 (9th Cir. 1996), the Ninth Circuit held categorically that collection activities of guaranty agencies under the HEA are subject to the FDCPA.

57.     Simply put, if ECMC is nothing more than a debt collector, acting like a debt

collector by acquiring delinquent and defaulted student debts, adding collection fees to the balances like "debt collectors" do, and making collection calls to receive payments thereon, through various collection programs, including the predatory "rehabilitation program," discussed herein, then they will be liable as a debt collector. Id.

### FDCPA Violations by ECMC

58.     A debt collector may not communicate with a consumer at any unusual time or place known, or that should be known, to be inconvenient to the consumer. 15 U.S.C. § 1692c(a)(1). Here, Mr. Sarang's call was placed after hours, around 9:00 pm to 10:00 pm.

59.     A debt collector may not communicate with a consumer at the consumer's place of employment where on-the-job personal communications are prohibited. 15 U.S.C. § 1692c(a)(2). Mr. Manchanda indicated he did not take calls at work, but Mr. Sarang nonetheless sought his work phone number, address, and other contact details. Audio Recording at 1:30-2:15.

60.     Contacts with the consumer's relatives, other than the spouse, violate the FDCPA. Here, Mr. Sarang at the end of the Audio Recording asked for contact details for a number of 3rd parties, including Rishi Manchanda and Dr. Sapna Muragali (Mr. Manchanda's ex-girlfriend's Mom of 20-years-ago), and Sara Manchanda (Mr. Manchanda's Mom). Audio Recording 28:00-31:00.

61.     The FDCPA also prohibits harassing or abusive communications, 15 U.S.C. § 1692d(1)-(6),[5] and the communication of false or misleading representations in attempting to collect a debt, particularly where these practices improperly take advantage of the debtor and benefit the debt collector. 15 U.S.C. § 1692(e).  Here, the entire interaction with Mr. Sarang was misleading and misrepresented Mr. Manchanda's options, because accepting $36,559.19 in collection costs to "get out of default" and to rehabilitate the loan was sold to Mr. Manchanda as his only option, after never having received the "Notice of Default" giving him 60 days to cure, when in fact, ECMC

purposely steered Mr. Manchanda down the default/rehabilitation path rather than providing debtor

counseling, motivated by the substantial fees ECMC could earn by doing so.

62.     Section 1692(e) explicitly outlines 16 types of representations that amount to per

se violations. For example, § 1692(e)(4) prevents collectors from falsely representing the potential

results of nonpayment of the debt. Section 1692(e)(5) prohibits collectors from threatening to take

action that is not intended or that amounts to a legal violation of the Act. Additionally, § 1692(e)(11)

makes it the affirmative duty of the debt collector to "disclose clearly in all communications made

to collect a debt or to obtain information about a consumer, that the debt collector is attempting to

collect a debt and that any information obtained will be used for that purpose." Manchanda claims

that ECMC violated §§ (e)(4), (5) and (11) in attempting to collect on his defaulted loan.

63.     The FDCPA's exception for collection activities "incidental to a bona fide fiduciary

obligation" does not apply to ECMC's activities in this case.

Respectfully Submitted,

Dated:  New York New York           FAZZIO LAW OFFICES
        May 25, 2021


_s/ John P. Fazzio_
By: John P. Fazzio (1752)
**FAZZIO LAW OFFICES**
305 Broadway, 7th Floor, Ste. 19
New York, NY 10007
Phone: (201) 529-8024
Fax: (201) 529-8011